UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION

EMMANUELLA ARMAND, NERILENE
BALLARD, CHARLINE BOUFIN-
TEBEU, JAVIER CUMERMA, KEVIN
KERRICK, and TOLULOPE ODUYEJO-
WILLIAMS, on behalf of themselves and all
those similarly situated in the State of
Florida,

              Plaintiffs,                  CASE NUMBER:

v.                               **CLASS & COLLECTIVE ACTION**

LIFESTANCE HEALTH GROUP, INC.,
and LIFESTANCE HEALTH, INC.,

              Defendants.
_____/

## **COLLECTIVE AND CLASS ACTION COMPLAINT**

The individuals named and identified above as Plaintiffs, on behalf of themselves and other similarly situated individuals (hereinafter to be referred to collectively as the "Plaintiffs"), file this lawsuit against LIFESTANCE HEALTH GROUP, INC. and LIFESTANCE HEALTH, INC., and allege the following:

## **JURISDICTION AND VENUE**

1.    This Court has original subject matter jurisdiction pursuant to the Fair Labor Standards Act (29 U.S.C. § 201, et. seq.) for the claims alleged in both Counts I and II and the federal Declaratory Judgment Act (28 U.S.C §2201(a)) (Count III), by virtue

of 28 U.S.C. § 1331 since these claims involve a federal question Additionally, This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 under § 1332(d)(2) because this is a hybrid class action where any member of a class of plaintiffs is a citizen of a state different from any defendant and the aggregated amount in controversy exceeds $5,000,000, exclusive of interest and costs.

2.      This Court has supplemental jurisdiction over the remaining state common law claims based on 28 U.S.C. § 1367, as the state common law claims share all common operative facts with the federal law claim, and the parties are identical.  Resolving all state and federal claims in a single action engenders the best interest of judicial economy and fairness to the litigants.

3.      Venue is proper in this District based on 28 U.S.C. § 1391 because the acts giving rise to the issues involved in this lawsuit occurred within the boundaries of this District (as opposed to other districts in the State of Florida), including but not limited to, the greater portion of class member residing and providing clinical services to LifeStance's patients within the boundaries of this District.

## PARTIES NAMED IN THIS LAWSUIT

4.      LifeStance Health Group, Inc. ("LSHG") is a Delaware corporation that maintains its principal place of business at 4800 North Scottsdale Road, Suite 600, Scottsdale, Arizona.  LSHG is a publicly traded corporation whose securities are listed and traded on The Nasdaq Stock Market under the symbol LFST.  LSHG is a citizen of the states of Delaware and Arizona.

5.      LifeStance Health, Inc. ("LSH") is a Delaware corporation that maintains its principal place of business at 10655 N.E. 4th Street, Suite 901, Bellevue, Washington, 98004.  LSH is a wholly owned subsidiary of LSHG and has had its operations consolidated and merged into those of LSHG because of the initial public offering completed in June 2021, thereby making LSHG the successor in interest of all LSH's obligations including being deemed a joint employer of each Provider.  (LSH and LSHG shall be referred to collectively as "LifeStance").  LSH is a citizen of the states of Delaware and Washington.

6.      Plaintiffs are/were non-doctor employees of LifeStance, employed by the corporation as a "Provider," a term used by LifeStance to identify mental health clinicians (including nurse practitioners) that provide treatment to children, adolescents, and adults suffering from a variety of mental health issues.  Here, the term "Provider" refers to a licensed mental health clinician employed by LifeStance who is (a) a psychotherapist or psychologist; or (b) a psychiatric and mental health nurse practitioner and who are not licensed medical doctors.

7.      In this instance the Plaintiffs and all putative class/collective class members are non-exempt psychiatric and mental health nurse practitioners that worked in the State of Florida for LifeStance.  Every Provider is forced to sign the Defendants' form Provider Employment.

## COLLECTIVE ACTION ALLEGATIONS

8.      Plaintiffs (and all putative members of the collective action) were (and some continue to be) non-exempt psychiatric and mental health nurse practitioner

employees of LifeStance (called "Providers" by LifeStance, as defined above) who provided mental health services to LifeStance clients within the State of Florida at any time from 2017 to the entry of judgment in this case (the "*Collective Period*") and who were (A) not paid minimum wage for all hours worked and/or, (B) did not receive overtime wages when appropriate, and/or (C) have been told by LifeStance that they must pay back to the Company monies previously disguised as wages.

9.     Plaintiffs and putative class members were non-exempt employees for the applicable time periods and were issued W2s for services performed on behalf of LifeStance.

10.     Plaintiffs and putative class members generally worked over 40 hours in at least one given work week per year.

11.     Plaintiffs and putative class members received a salary or fee basis at a rate of less than $450 per week. In fact, as a result of the predatory practices of LifeStance, Plaintiffs and putative class members would work at least 40 hours per week, but were paid $0 for the work conducted, in part because LifeStance would require that Plaintiffs and putative class members pay back the monies for time worked.

12.     LifeStance's employee compensation practices violate the Fair Labor Standards Act, 29 U.S.C. §§ 206, 207, 215 (the "FLSA"), which obligates employers to pay non-exempt employees, including overtime and minimum wages, for all hours worked, among other issues addressed in the statute and the myriad of Court decisions interpreting the statute.

13.    Pursuant to the FLSA, Plaintiffs, and all others similarly situated, seek to prosecute their claims as a collective action on behalf of all current and former LifeStance employees during the applicable statutory period who were not compensated appropriately for all hours worked.

14.    A collective action is appropriate in this circumstance because the collective action members are similarly situated in that 1) they were subjected to LifeStance's unlawful compensation program and policies which compensated them less than the federal minimum wage for all hours worked and/or failed to pay overtime wages when appropriate; 2) they were victims of LifeStance's failure to pay wages; 3) they were forced to endure predatory and retaliatory behavior from LifeStance that denied them compensation, prescribed false debt upon them, or forced termination of employment (i.e. constructive termination); and 4) further acts of unlawful conduct described later in this pleading consistent with applicable law, including, but not limited to, forcing indentured servitude vis-à-vis the unlawful and unconstitutional Provider employment agreement that LifeStance required each of these individuals to sign as a condition of employment and continued employment.

15.    Plaintiffs, and all others similarly situated, are also seeking statutory liquidated damages as provided by federal law for LifeStance's failure to pay wages as required by the FLSA, among other things.

16.    The class of similarly situated individuals or potential Collective members sought to be certified pursuant to the FLSA is defined as:

any person that was or is a non-doctor clinician employed by LifeStance and who conducted work for LifeStance in the State of Florida during the Collective Period that 1) was subjected to LifeStance's unlawful compensation program and policies which compensated him/ her less than the federal minimum wage for all hours worked and/or failed to pay overtime wages when appropriate; 2) that was a victim of LifeStance's failure to pay wages; 3) that was forced to endure predatory and retaliatory behavior from LifeStance that denied them compensation or forced termination of employment (i.e. constructive termination); and 4) that was forced to enter into an unlawful and unconstitutional provider employment agreement, which LifeStance required its providers to sign as a condition of employment and continued employment.

17. The precise size and identity of the entire Collective Action Class is ascertainable from the business records, tax records, and/or employee personnel records of LifeStance, including its website (https://lifestance.com), which provides the name of all Providers purportedly "currently employed" by LifeStance.

18. LifeStance compensated the Collective Action Members in the same manner and under the same unlawful employee compensation program, and each of them has worked in Florida during the Collective Period.

19. Plaintiffs maintain the right to modify the Collective Class member definition and/or to create additional subclasses or classes, if necessary, and to revise these definitions to maintain cohesive classes which do not require individual inquiry to determine liability.

## CLASS ACTION ALLEGATIONS

20. Plaintiffs (and all putative members of the Class Action) were (and some continue to be) non-exempt psychiatric and mental health nurse practitioner employees of LifeStance (called "Providers" by LifeStance, as defined above) who

provided mental health services to LifeStance clients within the State of Florida at any time from 2017 to the entry of judgment in this case (the "Class Period") and who were (A) not paid minimum wage for all hours worked and/or, (B) did not receive overtime wages when appropriate, and/or (C) have been told by LifeStance that they must pay back to the Company monies previously disguised as wages.

21.     Pursuant to Fed. R. Civ. P. 23, Plaintiffs, and the Class Members, seek to prosecute their Florida common law claims as a class action on behalf of all current and former LifeStance employees who were not compensated appropriately for services performed as providers for LifeStance.

22.     A class action is appropriate in this circumstance because the Class Members are similarly situated in that they were subjected to LifeStance's unlawful employment practices while performing services on LifeStance's behalf, such as providing treatment to children, adolescents, and adults suffering from a variety of mental health issues and increasing profits for the benefit of LifeStance through their activities.

23.     Plaintiffs and putative class members were non-exempt employees for the applicable time periods and were issued W2s for services performed on behalf of LifeStance.

24.     The class of similarly situated individuals or potential Class Members sought to be certified pursuant to Fed. R. Civ. Pro. 23 is defined as:

> any person that was or is a non-doctor clinician employed by LifeStance and who conducted work for LifeStance in the State of Florida during the Class Period that 1) was subjected to LifeStance's unlawful compensation program and policies which compensated him/ her less than the federal minimum wage for all hours worked and/or failed to pay

overtime wages when appropriate; 2) that was a victim of LifeStance's failure to pay wages; 3) that was forced to endure predatory and retaliatory behavior from LifeStance that denied them compensation or forced termination of employment (i.e. constructive termination); and 4) that was forced to enter into an unlawful and unconstitutional provider employment agreement, which LifeStance required its providers to sign as a condition of employment and continued employment.

25.    The precise size and identity of the entire class is ascertainable from the business records, tax records, and/or employee personnel records of LifeStance, including its website (https://lifestance.com), which provides the name of all Providers purportedly "currently employed" by LifeStance.

*Numerosity*

26.    Class Members are so numerous that their individual joinder is impracticable. Although the precise identities, numbers and addresses of all Class Members are currently unknown to Plaintiffs, the facts on which the calculation of that number can be based are presently within the sole control of LifeStance. Upon information and belief, there are hundred (400) or more potential Class Members during the Class Period.

*Existence of Common Questions of Fact and Law*

27.    There is well-defined commonality in the questions of law and fact involved affecting Class Members. The common questions of law include, but are not limited to:

a.    Whether LifeStance employed Class Members within the meaning and classifications as prescribed by law.

b.      What proof of hours worked is sufficient where employers fail in their duty to maintain time records.

c.      Whether LifeStance failed and/or refused to pay Class Members for services performed by the Class Members for the direct benefit of LifeStance.

d.      Whether LifeStance failed and/or refused to compensate Class Members for all hours worked and benefits conferred on behalf of LifeStance.

e.      The misclassification and/or appropriate classification of the Class Members.

f.      Whether provisions in the employment agreement between the provider and LifeStance were unconscionable.

g.      Whether the employment agreement between the provider and LifeStance is void and unenforceable.

i.      Whether LifeStance acted with intention—willfully and maliciously—in its actions; and

i.      Whether LifeStance is liable for all damages claimed hereunder, including but not limited to compensatory, liquidated, interest, costs and disbursements, and attorneys' fees.

*Typicality*

28.   Plaintiffs' claims are typical of the claims of all Class Members because they were employed in the same capacity during the Class Period; Plaintiffs experienced

the same harms and violations of law as all other Class Members.   Additionally, all claims arise from the same conduct and factual basis including LifeStance's historical unlawful compensation practices, as described above.

### *Adequacy*

29.     Plaintiffs are adequate representatives of Class Members because their interests do not conflict with the interests of the other Class Members they seek to represent. Plaintiffs have retained competent trial counsel for this class action and intend to vigorously pursue this action.   Plaintiffs and their trial counsel will fairly and adequately protect the interests of Class Members.

### *Predominance and Superiority*

30.     A class action is superior to other available methods for the fair and efficient adjudication of this litigation—particularly in the context of wage litigation like the present action, where individual plaintiffs may lack the financial resources to vigorously prosecute a lawsuit in federal court against LifeStance.

31.     The individual members of the class do not have an interest in or capacity to bring separate actions.

32.     The named plaintiffs find it is desirable to concentrate the litigation into one cohesive case. There are no likely difficulties that will arise in managing the class action.

33.     This suit may be maintained as a class action under Federal Rule of Civil Procedure 23(b)(3) because questions of fact and law common to the Class Members predominate over the questions affecting only individual members of the class; a class

action is superior to other available means for the fair and efficient adjudication of this action.

34.     The damages suffered by individual Class Members may be disproportionate to the burden and expense of complex litigation of these claims on an individual basis.

35.     Additionally, individual litigation may lead to inconsistent and conflicting judgments against LifeStance; therefore, effective redress for every Class Member may be limited or impossible.

36.     A class action which involves all Class Members favors judicial economy, fairness, and provides the benefit of a single, consistent, adjudication on the issues herein claimed.

37.     Plaintiffs maintain the right to modify the class and or create additional subclasses or classes, if necessary, and to revise these definitions to maintain cohesive classes which do not require individual inquiry to determine liability.

## OVERVIEW OF LIFESTANCE AND ITS BUSINESS MODEL

38.     LifeStance defines itself as a mental healthcare company focused on providing evidence-based, medically driven treatment services for children, adolescents, and adults suffering from a variety of mental health issues in an outpatient care setting, both in-person and through its digital health telemedicine offering.

39.     LifeStance claims that it is one of the nation's largest providers of virtual and in person outpatient mental health care. At the time of its initial public offering, LifeStance operated 370 Centers and employed 3,300 Providers across 27 states.

40.    LifeStance represents to the general public that it is the provider of virtual and in-person outpatient mental healthcare for children, adolescents, and adults experiencing a variety of mental health conditions including depression, anxiety disorder, schizophrenia, and post-traumatic stress disorder.

41.    LifeStance promotes that it is committed to state-of-the-art clinical excellence, to partnership and collaboration with other treating health care providers to ensure continuity of care, to the utilization of data to individually tailor services for continual improvement in outcomes, and to empowering patients to make informed choices and help them achieve their goals.

42.    According to its public filings with the Securities and Exchange Commission, LifeStance describes itself as follows:

> We employed 4,790 licensed mental health clinicians through our subsidiaries and affiliated practices in 32 states as of December 31, 2021. Our clinicians offer patients a comprehensive suite of mental health services, spanning psychiatric evaluations and treatment, psychological and neuropsychological testing, and individual, family and group therapy. We treat a broad range of mental health conditions, including anxiety, depression, bipolar disorder, eating disorders, psychotic disorders and post-traumatic stress disorder.

> Patients can receive care virtually through our online delivery platform or in-person at one of our conveniently located centers. Through our more than 250 payor relationships, including national agreements with multiple payors, patients can utilize their in-network benefits when they receive care from one of our clinicians, enhancing access and affordability.

43.   LifeStance states that it generates "revenue on a per-visit basis when a patient receives care from one of our clinicians. Depending on the state, our clinicians are either employed directly through our subsidiaries or through our affiliated practices, for which we manage day-to-day operations pursuant to long-term management services contracts."

44.   LifeStance professes that its revenue is generally derived from in-network insurance coverage, pursuant to which its subsidiaries or affiliated practices are reimbursed for patient services.

45.   LifeStance's contracts with payors are typically structured as fee-for-service arrangements, with negotiated reimbursement rates for its clinical services.

46.   With respect to its affiliated practices, LifeStance's revenue is derived from management fees negotiated under its management services contracts.

47.   LifeStance benefitted from state and local lockdown orders necessitated during the COVID-19 pandemic starting the spring of 2020.

48.   Total patient visits increased from 931,934 in 2018 to 1,353,285 in 2019, all the way to 2,290,728 in 2020.  LifeStance's total revenue grew from $100.3 million in 2019 to $212.5 million in 2019 all the way to $377.2 million in 2020.

49.   By December 2020, several COVID-19 vaccines were being approved and administered, meaning LifeStance's access to clients seeking virtual mental health services would significantly decline while demand for in-person services would increase.

50.     Upon information and belief, LifeStance's internal company records demonstrated that providing virtual services cost LifeStance far less as its service providers could work from home, avoiding the costs of high rents for offices, office personnel staff, and related expenses.

51.     Also, because LifeStance had been utilizing clinicians from around the country to meet strong patient demand during the COVID-19 lockdowns, increasing inpatient service, demand was increasing the workload on certain of its clinicians, many of whom were getting burned out and resigning, requiring that new clinicians be hired and trained.

52.     On or about February 16, 2021, LifeStance filed with the SEC a Registration Statement on Form S-1, which, after several amendments made pursuant to comments from the SEC, would later be utilized for the IPO.

53.     On August 11, 2021, less than two months after the IPO, LifeStance announced its second quarter 2021 ("2Q21") financial results for the period ending June 30, 2021 (just days after the IPO), disclosing a net loss of $70 million, compared to a net loss of just $27.6 million for the period from April 1, 2020, to May 14, 2020 (Predecessor) and $4.3 million for the period from April 13, 20202020, to June 30, 2020 (Successor). Critically, during the 2Q21, LifeStance's operating expenses had more than tripled.

54.     LifeStance also guided for full fiscal year 2021 total revenue of just $668 million to $678 million ($168 million to $173 million in the third quarter 2021 and $196 million to $201 million in the fourth quarter 2021) and Adjusted EBITDA of just $47 million to $53 million ($8 million to $11 million in the third quarter 2021 and $12 million to

$15 million in the fourth quarter 2021). There were multiple reasons for the massive increase in LifeStance's operating expenses during the 2Q21.

55.     Based on its business model, LifeStance is entirely dependent on the employment of Providers to service its patients to generate revenue.  For example, LifeStance's gross revenues are a factor of the number of providers it employs times the number of daily patient engagements each provider experiences – (5000 providers) * (25 daily encounters) * ($100 per encounter) would be $25,000,000 per day in revenue.  Thus, there

56.     There was a major incentive for LifeStance to focus on increasing the number of providers in its employ while also increasing the number of patient encounters per provider.

57.     Upon information and belief, LifeStance embarked on a pattern and scheme, starting in 2019 and continuing to the time of its initial public offering to increase the number of its providers to artificially inflate its revenues to support the representations that it made in its initial public offering documents to induce investment in its initial public offering as alleged in the class action lawsuit pending in the United States District Court for the Southern District of New York, a case styled – Nizar S. Nayani et al vs. LifeStance Health Group, Inc. et al., Case No. 1:22-cv-06833 (SDNY 2022).

58.     In its efforts to increase the number of providers generating revenues for the corporation, LifeStance acquired and opened numerous facilities throughout the United States (in this instance, in the State of Florida) and indiscriminately placed providers in those facilities knowing that it did not have sufficient patient numbers to

achieve its revenue projections as stated in its public filings with the U.S. Securities and Exchange Commission.

### THE BAD ACTS LEADING UP TO THE FILING OF THIS LAWSUIT

59. Upon information and belief, LifeStance made a concerted effort to increase the number of providers by offering Plaintiffs and those similarly situated Collective and Class Members what appeared to be a lucrative and beneficial employment opportunity, which turned out to be an operose indentured servitude from whence the employee could not escape.

60. LifeStance failed to compensate Collective and Class Members in compliance with Federal and Florida state laws. Additionally, LifeStance forced the Collective and Class Members to sign an unconscionable and vague employment agreement that is inherently void against public policy as it forces the employees to essentially work for free and incur massive debt from LifeStance for the privilege of working for the company.

61. For example:

    a. LifeStance failed to pay the Collective and Class Members all compensation legally due and promised, including their respective percentage of amounts billed to insurance.

    b. LifeStance made improper deductions from the Collective and Class Members' compensation, which includes its unlawful decision to garnish their wages to illegally collect on an ersatz debt in favor of LifeStance that the Collective and Class Members did not agree to incur.

c.   LifeStance made numerous improper unilateral revisions to the Collective and Class Members' paystubs under the guise of a correction, which often created improper and additional tax liability for them.

d.   LifeStance wrongfully withheld (and failed to pay) the entirety of compensation due and payable to the Collective and Class Members.

e.   LifeStance intentionally and wrongfully misclassified income on the Collective and Class Members' paystubs, often suggesting that they were being compensated (and taxed), when in fact the corporation was surreptitiously generating an enormous ersatz debt obligation that it expected the Collective and Class Members to satisfy.

f.   LifeStance made several errors in terms of payroll related taxes of compensation paid to the Collective and Class Members, including double taxing income.

62.   In addition to its failure to compensate the Collective and Class Members properly and lawfully, LifeStance surreptitiously and unlawfully created a debt obligation under the guise of an illicit "claw back of wages" provision within the form employment agreement that it obligates all providers (i.e., the Collective and Class Members) to sign.

63.   By virtue of its decision to claw back wages paid to Collective and Class Members, LifeStance was able to artificially increase the number of Providers without having to absorb the entire expense of employing these individuals.

64.     LifeStance's decision to claw back wages from its employees ensures that no or few employees receive the total compensation that was promised to them during their first 12 to 14 months of employment, and often impacts income for the succeeding six to ten months.

65.     LifeStance's illegal method of compensating its Providers creates such stress and duress, that Providers routinely resign from their employment with LifeStance to take a position with another employer, generally carrying debt from the claw back of wages during their tenure of employment with LifeStance.

## **GENERAL ALLEGATIONS**

66.     Plaintiffs have engaged the law firm of éclat Law, PA to serve as its lead trial counsel and are obligated to compensate trial counsel for services rendered in connection with prosecuting the Collective and Class Members' rights as alleged herein.

67.     All conditions precedent to filing this lawsuit have occurred, have expired, or have been effectively waived.

## **COUNT I: FAILURE TO COMPLY WITH THE FAIR LABOR STANDARDS ACT – UNPAID WAGES**

68.     The Collective and Class Members reallege and incorporate by reference the allegations contained in paragraphs 1 through 67 as if fully set forth herein.

69.     This is a cause of action for unpaid wages and damages under the Fair Labor Standards Act, 29 U.S.C. § 201, et. seq.

70.    LifeStance was or continues to be the Collective Class Members' employer within the meaning of FLSA 29 U.S.C. §203(d).

71.    The Collective Class Members were or continue to be "employees" of LifeStance within the meaning of FLSA, 29 U.S.C. § 203. Although the Plaintiffs are medical professionals (however, they are not doctors), they were W2 employees that literally received _no income_ for several weeks out of the year for the service they provided to patients on LifeStance's behalf. Moreover, in other weeks out of the applicable Collective Period, the Plaintiffs earned less than $450 per week. Further, the company unlawfully disguised a debt (that it now treats as an asset to the company for purposes of its public offerings) as a "salary" to Plaintiffs—a salary that Plaintiffs never truly received, but instead "must" pay back to the company for work that they performed on the company's behalf.

72.    The Collective Class Members were hired by LifeStance to perform duties on behalf of and for the benefit of LifeStance consistent with its overall business platform and objectives.

73.    By failing to pay the Collective Class Members minimum wages, overtime wages, failing to outright pay complete wages free and clear as required by law, LifeStance has violated Sections 206, 207, and 215 of the FLSA, amongst other laws, and such conduct was willful within the meaning of the FLSA.

74.    LifeStance understood it had an affirmative obligation to pay the Collective Class Members for all hours that they spent working for its benefit, yet it intentionally and routinely failed to pay such compensation as described above.

75.    LifeStance maintained a culture of toxicity and a hostile work environment during, after, and before the applicable period at issue, which included, but was not limited to, the indentured servitude described previously in this pleading.

76.    Instead of lawfully paying its employees, LifeStance established and maintained systems, policies, and procedures that were intentionally designed to avoid paying employees their earned wages as detailed in the paragraphs above.

77.    LifeStance has engaged in a widespread systematic pattern, policy, and practice of violating the FLSA, as detailed throughout this Complaint.

78.    The Collective Class Members are entitled to be paid at least minimum wage for all hours worked during the workweek pursuant to FLSA 29 U.S.C. § 206.

79.    LifeStance violated FLSA 29 U.S.C. § 206 by failing to pay the Collective Class Members minimum wages for all hours worked, as described above, and caused the Collective Class Members to suffer lost wages and interest thereon.

80.    Similarly, there were several instances where LifeStance simply did not pay *any* wages owed to the Collective Class Members.

81.    Due to LifeStance's misconduct and malevolent employee compensation practices, the Collective Class Members did not earn wages at the required minimum wage rate or overtime rates for all hours worked during one or more work weeks.

82.    LifeStance knowingly and willfully carried out its illegal pattern or practice of failing to pay proper wages as compensation.

83.    As a result of LifeStance's intentional, willful, and unlawful acts in refusing to pay the Collective Class Members minimum wages, overtime wages, and wages in

general (i.e., no payment was made at all) for one or more workweeks during the applicable Collective Period, the Collective Class Members have suffered damages, and incurred reasonable attorneys' fees and costs as provided in the FLSA statute.

84.    As a result of LifeStance's willful violation of FLSA § 206, 207, and 215, the Collective Class Members are entitled to recover the full amount of any unpaid back wages unlawfully withheld, and any damages experienced due to LifeStance's retaliatory acts and liquidated damages as per 29 U.S.C. § 216 and other provisions within the FLSA statute.

85.    The Collective Class Members are entitled to recover from LifeStance their unpaid minimum wages/overtime wages, damages for unreasonably delayed payment of wages, and any damages experienced due to LifeStance's retaliatory acts, liquidated damages or pre-judgment interests, reasonable attorneys' fees, and costs and disbursements pursuant to the FLSA statute.

86.    Because LifeStance's violations of the FLSA have been willful, a three-year statute of limitations applies pursuant to 29 U.S.C. § 255.

WHEREFORE, the Collective Class Members demand judgment against LIFESTANCE HEALTH GROUP, INC. and LIFESTANCE HEALTH, INC. for all remedies available under Fair Labor Standards Act, 29 U.S.C. § 201, et. seq, together with all other relief to which the Collective Class Members may be entitled at law or in equity, including liquidated damages and attorneys' fees.

## COUNT II - FAILURE TO COMPLY WITH THE FAIR LABOR STANDARDS ACT – KICK BACKS

87.    The Collective Class Members reallege and incorporate by reference the allegations contained in paragraphs 1 through 67 as if fully set forth herein.

88.    Pursuant to 29 C.F.R. § 531.35, wages cannot be considered to have been paid by the employer to the employee unless they are paid finally and unconditionally or "free and clear."

89.    Further, wage requirements will not be met where the employee is required to "kicks-back" directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wages delivered to the employee.

90.    Kickbacks include but are not limited to direct reductions in employee's pay checks for the benefit of the employer, amongst other things.

91.    LifeStance routinely made arbitrary deductions to the Collective Class Members' pay without reason or description—a benefit kicked-back directly to LifeStance. For example, LifeStance engaged in the following misconduct:

> a. LifeStance, without the express agreement (particularly in light of the ambiguities that Plaintiffs have raised in relation to the unconscionable employment agreement) of the Collective Class Members, deducted portions of their earned wages claiming that the wages were an "advance" and not income earned for the services that the Collective and Class Members provided.

b. LifeStance failed to pay the Collective Class Members for supervising staff members as required by their provider employment agreements and LifeStance's corporate policies and procedures.

c. LifeStance frequently misclassified income, paying the Collective Class Members less money than what each was entitled to receive.

d. LifeStance frequently did not pay the Collective Class Members their percentage of all items billed to insurance for patients they treated.

e. LifeStance imposed a claw back on wages paid or due to the Collective Class Members, thereby taking back wages that were otherwise due and owing to the Collective and Class Members.

92.    The Collective Class Members were routinely forced to kick-back their wages to LifeStance, which consequently benefitted the employer.

93.    LifeStance's arbitrary and unlawful deductions of the Collective Class Members' earned wages resulted in LifeStance's willful violation of 29 C.F.R. § 531.35 as the Collective Class Members' pay was not provided "free and clear" of other conditions. In fact, wages appeared to be conditioned upon repayment of a "loan" to W2 employees that must be paid back to the employer in full.  In fact, these deductions at many times during their tenure with LifeStance caused Collective Class Members to earn $0 for work conducted or, less than $450.00 in a given week.

94.   As a direct and proximate result of the kickbacks described throughout this Complaint, the Collective Class Members were damaged because they did not enjoy the earned benefit of their whole paycheck, without any kickbacks to LifeStance.

WHEREFORE, the Collective Class Members demand judgment against the two Defendants for all remedies available under 29 C.F.R. § 531.35 including compensation that was kicked-back to LifeStance, plus interest, attorneys' fees, and cost, including any other remedy provided and applicable under law.

## COUNT III: DECLARATORY RELIEF

95.   The Class Members reallege and incorporate by reference the allegations contained in paragraphs 1 through 67 as if fully set forth herein.

96.   This is a claim against LifeStance pursuant to the federal Declaratory Judgment Act, 28 USC §2201(a), seeking a declaration that the provider employment agreements that LifeStance obligates Providers to sign is unlawful, unconstitutional, and unenforceable, especially the claw back provisions contained in the agreements, which effectively causes providers to receive no compensation for work performed by the provider—a $0 net income, and at most times, a negative income as a result of a fraudulent debt.

97.   The parties are in dispute as to the validity and enforceability of the employment contract at issue.

98.   Pursuant to the various demands for payment submitted against Plaintiffs, it is clear that LifeStance's position is that the contract as written is valid, binding, and enforceable. LifeStance has also threatened legal action against Plaintiffs for

nonpayment. Plaintiffs affirmatively assert that the employment agreement is not valid, binding, or enforceable—they argue that it is ambiguous, unconscionable, and against public policy to require that employees enter into an unlawful debt obligation as a condition of employment; Plaintiffs assert that the false debt that is created by the agreement is also not valid, binding, or enforceable against them. Hence, an actual controversy exists as to the rights and obligations of the respective parties.

99.    As stated throughout this pleading, LifeStance illegally claws back wages that it pays to its Providers by calling wages "an advance" in its fallacious attempt to create the illusion that it is paying its employees the wages that it agreed to pay them when they accepted employment with LifeStance, while at the same time creating an artifice by which they can take a significant portion of those wages back from the employee, together with interest accruing on a monthly basis.

100.   LifeStance is of the opinion that its wage claw back provision is lawful, and thus it continues to require employment agreements with its Providers to include said claw back provisions and takes aggressive measures to collect on the ersatz debt created by the claw back provision.

101.   As previously mentioned, Plaintiffs, on the other hand, contend that the claw back provision (truly the contract as a whole) is unlawful, unconstitutional and engenders the ancient practice of indentured servitude for Providers, which has long since been banned in the United States. The provisions are clearly against public policy as it is certainly against the public interest to allow a publicly traded company to avoid paying its employees. It instead requires that its employees pay it (the company) for

the time that the employees performed work for the company. In essence, there is no benefit provided to the employee whatsoever in exchange for performing work on behalf of the company. The company retains all the benefit of the insurance payments issued for the care performed on patients by the provider and the company is able to increase its apparent assets by whatever total amount is owed as debt to them from their employees.

102.   Plaintiffs request that the Court intervene to interpret the provider employment agreements and make affirmative findings to determine:

    a)  Whether the "claw back" / "advance" provisions of the contract are void and unenforceable, eradicating the entire contract as compensation provisions are a material term of the contract;

    b)  Whether Section 9.5 of the employment contract regarding "Obligations Upon Termination" is void and unenforceable as it relates to the repayment/reimbursement of the Incentives/Advance/Debt;

    c)  Whether the "Compensation" and "Advance on Compensation" provisions of the contract (and accompanying schedule) are void and unenforceable, eradicating the entire contract as compensation provisions are a material term of the contract; and

    d)  Whether the contract between the parties created a valid, binding, enforceable, and lawful monetary repayment obligation (debt) against Plaintiffs and in favor of LifeStance.

103.   Plaintiffs have no adequate remedy at law.

104.   An exemplar "Employment Agreement" is attached hereto as Ex. 1.

105.   Ultimately, Plaintiffs would seek a declaration that the entire contract be found void and unenforceable, including the eradication of the false debt that LifeStance attempts to create vis a vis the employment contract.

WHEREFORE, Plaintiffs and Class Members demand entry of a judgment declaring that the employment contract in its entirety is void and unenforceable, including the eradication of the false debt that LifeStance attempts to create through the employment contract, together with any other remedy provided and applicable under law.

## COUNT IV: VIOLATIONS OF THE STATE FAIR DEBT COLLECTIONS PRACTICES ACT

106.   The Class Members reallege and incorporate by reference the allegations contained in paragraphs 1 through 67 as if fully set forth herein.

107.   This is an action against the Defendants for violation of Florida Statute, Section 559.72 et seq.—Florida Consumer Collection Practices Act—(the "Florida Act"), stemming from the Defendants' acts and omissions concerning a fraudulent debt contrived by the Defendants within an employment contract between the parties as described herein.

108.   LifeStance required Plaintiffs to sign its provider employment agreement,[1] which purportedly lays out the terms and conditions of employment and the compensation that one would receive as an employee of LifeStance.

---

[1] The Class challenges the validity and enforceability of this contract as a whole.

109.   Within the agreement, LifeStance intentionally and wrongfully misclassified income on Plaintiffs' paystubs, often suggesting that they were being compensated (and taxed), when in fact the corporation was surreptitiously generating an enormous ersatz debt/loan obligation that it expected Plaintiffs to satisfy as part of their employment.

110.   This debt obligation did not comply with the laws of the State of Florida.

111.   The repayment of the debt, loan, or advance was unclear and as the debt, loan, or advance evolved or changed, LifeStance did not appropriately disclose that information or obtain the express consent of such changes from Plaintiffs. To provide example, LifeStance would arbitrarily alter the principal or interest amounts, and the amounts upon which interest was compounded. The compounded interest, alongside the fluctuating principal resulted in interest rates above the statutory allowance of 18 percent per annum simple interest.

112.   However, despite unclear terms and unlawful interest rates, LifeStance demanded payment of the debt, loan, or advance from Plaintiffs on various occasions since the time of employment and after resignation.

113.   The debt itself and LifeStance's efforts to collect the proscribed debt were so onerous, numerous, and hostile that Plaintiffs were generally forced to give notice of resignation from employment with LifeStance. In other words, Plaintiffs were forced to be unemployed as a result of this debt to stop the further accumulation of debt.

114.   After employment with LifeStance (and in many instances during employment as well) several demands were made from LifeStance to Plaintiffs for the collection of

the inappropriate debt (the discussions and demands for the debt were made via mail, electronic mail, and phone).

115.   LifeStance is a debt collector and/or is an out-of-state debt collector within the meaning of the Florida Act. Upon information and belief, LifeStance is not a registered out-of-state debt collector, despite the fact that it issues demands for debt repayment to its employee-providers on a regular basis. In fact, the named plaintiffs and other former employee-providers have received frequent demands from LifeStance for collection of this debt. These letters frequently state that if LifeStance does not receive payment, it will "consider other legal options" as well.

116.   LifeStance is a debt collector within the meaning of the applicable Florida Statutes because it regularly (and frequently—to the extent that it is harassment) collects debts or attempts to collect debts from its employees and former employees, both directly and indirectly.

117.   A debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt, which is exactly what LifeStance has done to Plaintiffs.

118.   Other acts and omissions underlying this claim include, but are not limited to the following:

    a.   Failing to disclose, at the time when LifeStance made the job offer to Plaintiffs, that the accumulation of debt would be associated with their employment, which they would be expected to pay.

b.      Failing to disclose, at the time when LifeStance made the job offer to Plaintiffs, the complete material terms, and conditions of the debt obligation they would incur if they accepted the position with LifeStance.

c.      Failing to properly and timely disclose (in a manner that is clear and unambiguous) the balance of the debt, the methodology used to calculate the amount of the alleged debt as it accumulated each month, the interest rate, the terms for repaying the alleged debt, the penalties for nonpayment, and the accumulation of interest and penalties, consistent with the collection of any consumer debt.

d.      Failing to properly disclose deductions from Plaintiffs' compensation to pay down the balance of the proscribed debt, essentially constituting an illegal garnishment of Plaintiffs' wages.

e.      Engaging in hostile and improper debt collection practices, communications, and other actions to collect the proscribed debt from Plaintiffs.

119.    LifeStance's acts and omissions described above constitute violations of the Florida Act and are the direct and proximate cause of the damages that Plaintiffs have suffered as a result.

WHEREFORE, Plaintiffs demands judgement in their favor and against both Defendants for all damages and remedies available under Section 559 et seq., Florida Statutes, and for such other and further relief this Court deems just and proper.

## COUNT V: VIOLATION OF THE FLORIDA USURY STATUTE – FLORIDA STATUTE 687.04

120.   The Class Members reallege and incorporate by reference the allegations contained in paragraphs 1 through 67 as if fully set forth herein.

121.   This is an action against the Defendants for violation of Florida Statute, Section 687.04 et seq.—Florida's Usury Statutes—(the "Florida Act"), stemming from the Defendants' acts and omissions concerning a fraudulent debt contrived by the Defendants within an employment contract between the parties as described herein.

122.   LifeStance required Plaintiffs to sign its provider employment agreement,[2] which purportedly lays out the terms and conditions of employment and the compensation that one would receive as an employee of LifeStance. See Exemplar Exhibit 1.

123.   Within the agreement, LifeStance intentionally and wrongfully misclassified income on Plaintiffs' paystubs, often suggesting that he was being compensated (and taxed), when in fact the corporation was surreptitiously generating an enormous ersatz debt/loan obligation that it expected Plaintiffs to satisfy as part of their employment.

124.   This debt obligation did not comply with the laws of the State of Florida.

125.   The repayment of the debt, loan, or advance was unclear and as the debt, loan, or advance evolved or changed, LifeStance did not appropriately disclose that information or obtain the express consent of such changes from Plaintiffs. To provide example, LifeStance would arbitrarily alter the principal or interest amounts, and the

---

[2] The Class challenges the validity and enforceability of this contract as a whole.

amounts upon which interest was compounded. The compounded interest, alongside the fluctuating principal resulted in interest rates above the statutory allowance of 18 percent per annum simple interest.

126.   However, despite unclear terms and unlawful interest rates, LifeStance demanded payment of the debt, loan, or advance from Plaintiffs on various occasions since the time of employment and after resignation.

127.   The debt itself and LifeStance's efforts to collect the proscribed debt were so onerous, numerous, and hostile that Plaintiffs were generally forced to give notice of resignation from employment with LifeStance. In other words, Plaintiffs were forced to be unemployed as a result of this debt to stop the further accumulation of debt.

128.   After employment with LifeStance (and in many instances during employment as well) several demands were made from LifeStance to Plaintiffs for the collection of the inappropriate debt (the discussions and demands for the debt were made via mail, electronic mail, and phone).

129.   Other acts and omissions underlying this claim include, but are not limited to the following:

    a.  Failing to completely and clearly disclose, at the time when LifeStance made the job offer to Plaintiffs, that the accumulation of debt would be associated with their employment, which they would be expected to pay.

    b.  Failing to disclose, at the time when LifeStance made the job offer to Plaintiffs, the complete material terms, and conditions of the debt obligation they would incur if they accepted the position with LifeStance.

c. Failing to properly, completely, clearly, and timely disclose the balance of the debt, the methodology used to calculate the amount of the alleged debt as it accumulated each month, the interest rate, the terms for repaying the alleged debt, the penalties for nonpayment, and the accumulation of interest and penalties, consistent with the collection of any consumer debt.

d. Failing to properly disclose deductions from Plaintiffs' compensation to pay down the balance of the proscribed debt, essentially constituting an illegal garnishment of Plaintiffs' wages.

e. Engaging in hostile and improper debt collection practices, communications, and other actions to collect the proscribed debt from Plaintiffs.

130.   LifeStance's corrupt acts and omissions described above constitute violations of Florida's Usury Statute as LifeStance intends and attempts to take more than the legal rate of 18 percent per annum for the money that it purportedly (but wrongfully and inappropriately) loaned to Plaintiffs. These acts and omissions are the direct and proximate cause of the damages that Plaintiffs have suffered as a result.

WHEREFORE, PLAINTIFFS demand judgement in their favor and against both Defendants for all damages and remedies available under Section 687 et seq., Florida Statutes, and for such other and further relief this Court deems just and proper.

## COUNT VI: UNJUST ENRICHMENT

131.   The Class Members reallege and incorporate by reference the allegations contained in paragraphs 1 through 67 as if fully set forth herein.

132.   Plaintiffs conferred monetary and other business-related benefits upon LifeStance, who had knowledge thereof, by performing services on LifeStance's behalf, such as the establishment of business relationships, performing patient services, supervising staff and other subordinates on behalf of LifeStance, and promoting LifeStance to increase profits for LifeStance.

133.   LifeStance voluntarily accepted the benefits provided by Plaintiffs (described above), retained the benefits, and enjoyed those benefits.

134.   LifeStance was unjustly enriched, at the expense of Plaintiffs because LifeStance obtained and kept revenues that were generated solely by the work performed upon patients by Plaintiffs.

135.   The circumstances render LifeStance's retention of the benefit inequitable unless LifeStance pays Plaintiffs the value of the benefit conferred.

136.   Plaintiffs are entitled to damages because of LifeStance's unjust enrichment.

137.   WHEREFORE, PLAINTIFFS demand judgement in their favor and against both Defendants for damages, for attorneys' fees and costs, plus interest and for such other and further relief this Court deems just, equitable, and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Class Members/Collective Action Members respectfully request that judgment be entered in their favor and against Defendants, and:

a) Certification and acknowledgement of the Collective Action (Counts I-II of this litigation) and appointment of the above-named Plaintiffs and their counsel for the opportunity to represent the collective class action.

b) Certification of this action (Counts III-VI) as a Class Action pursuant to Fed. R. Civ. P. 23(b)(2) and (3) on behalf of members of the Class and appointment of the above-named Plaintiffs and their counsel to represent the class.

c) Awarding Class Members/Collective Action Members the relief sought in each individual Count.

d) Awarding Class Members/Collective Action Members and the above-named Plaintiffs liquidated damages as permitted by law.

e) Awarding Class Members/Collective Action Members and the above-named Plaintiffs attorneys' fees and costs pursuant to the applicable Federal and Florida laws.

f) Awarding Class Members/Collective Action Members and the above-named Plaintiffs punitive damages and/or pre-judgement interest pursuant to the applicable Federal and Florida laws.

g) Granting Class Action Members an Order on an expedited basis, allowing them to send notice of this action, pursuant to Fed. R. Civ. P. 23, to those similarly situated.

h) Granting Collective Action Members an Order, on an expedited basis, allowing them to send notice of this action as a collective action pursuant

to 29 U.S.C. § 216(b) to those similarly situated Collective Action Members.

i) Any other relief this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs respectfully request a jury trial on all triable issues above.

## **RESERVATION OF RIGHT TO AMEND COMPLAINT**

Plaintiffs reserve the right to file amendments to this complaint as may be appropriate.

Respectfully submitted,

éclat Law, PA
Post office Box 161850
Altamonte Springs, Florida 32716
Phone: (407) 636-7004
*Lead trial counsel to the Plaintiffs and each Class Member/Collective Action Member*

*/s/ Kevin K. Ross-Andino*
Kevin K. Ross-Andino, FBN 66214
kevin.ross@eclatlaw.com
Jolynn M. Falto, FBN 1002743
Jfalto@eclatlaw.com
Nikki Pappas Hudson, FBN 126355
nikki.pappas@eclatlaw.com
Crisol Lopez-Palafox, FBN 1031282
crisol.lopezpalafox@eclatlaw.com