UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION

EMMANUELLA ARMAND,
NERILENE BALLARD, CHARLINE
BOUFIN-TEBEU, JAVIER
CUMERMA, KEVIN KERRICK, and
TOLULOPE ODUYEJO-WILLIAMS,
on behalf of themselves and all those
similarly situated in the State of
Florida,

Case No: 6:23-cv-00103 PGB-EJL

CLASS & COLLECTIVE ACTION

JURY TRIAL DEMANDED

Plaintiffs,

vs:

LIFESTANCE HEALTH GROUP,
INC., a Delaware corporation,

Defendant.

_____

FIRST AMENDED COMPLAINT FOR FINANCIAL DAMAGES AND
INJUNCTIVE AND OTHER EQUITABLE RELIEF

The above-named individual plaintiffs bring this collective and class action lawsuit (individually and on behalf of others similarly situated) against *LifeStance Health Group, Inc.,* ("*LifeStance*"), and allege, upon personal information and knowledge as to their own actions, their counsel's investigation and upon information and good faith belief as to all other matters, the following:

I.    NATURE OF THIS ACTION

1.    Lead Plaintiffs, individually and on behalf of others similarly situated, file this action due to LifeStance's pattern and practice of (i) refusing to

pay them wages lawfully and professionally earned in performing their job responsibilities; (ii) ostracizing and condemning them for expressing their opinions about their compensation, the "advance" LifeStance contrived for each new Clinician, or anything having to do with patient billing; and (iii) seeking to reclaim wages lawfully earned by them under the guise of "an advance" despite the fact that this scheme to reclaim wages constitutes a violation of the Thirteenth Amendment to the United States Constitution.

2.      LifeStance's vulturine business practices are systematically deployed (without exception) throughout its entire network of facilities in the United States, directly impacting the Lead Plaintiffs and all others similarly situated in the same manner.

II.     JURISDICTION AND VENUE

3.      This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because all three claims alleged herein are based on a federal statute, and thus involve a federal question.

4.      This Court equally has original subject matter jurisdiction based on the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) because this is a class action where any member of a class of plaintiffs is a citizen of a state different from the defendant and the aggregated amount in controversy exceeds five million dollars, exclusive of attorney's' fees, interest, and costs.

5.     This Court has supplemental jurisdiction concerning the claim in Count III - the Federal Declaration Act, 28 U.S.C. §2201(a) - pursuant to 28 U.S.C. § 1367(a).

6.     Venue is proper based on 28 U.S.C. § 1391 because the acts giving rise to the issues involved in this lawsuit occurred primarily within the boundaries of this District.

III.    PARTIES

7.     LifeStance is a publicly traded Delaware corporation that maintains its principal place of business in Scottsdale, Arizona, but does business in over thirty states across the nation, including the State of Florida.

8.     Lead Plaintiffs (and the other individuals that would ultimately comprise the collective and class members) are currently, or were at one time, nonphysician employees of LifeStance classified as a "_Clinician_," a term used by LifeStance to identify nonexempt, W2 employees who provide mental health clinical treatment or therapy to children, adolescents, and adults suffering from a variety of mental health issues.

IV.    SUBSTANTIVE FACTS APPLICABLE TO ALL CLAIMS

   A.    _Overview of LifeStance and its Business._

9.     LifeStance boasts of being the nation's largest mental healthcare company focused on providing evidence-based, medically driven treatment services for children, adolescents, and adults suffering from a variety of mental

health issues in an outpatient care setting, both in-person and through its digital health telemedicine alternative.

10.     LifeStance likewise portrays itself as the largest provider of virtual and in-person outpatient mental healthcare for children, adolescents, and adults experiencing a variety of mental health conditions including depression, anxiety disorder, schizophrenia, and post-traumatic stress disorder.

11.     LifeStance boasts about its commitment to state-of-the-art clinical excellence, its partnership and collaboration with other treating health care providers to ensure continuity of care, its utilization of data to individually tailor services for continual improvement in outcomes, and its focus on empowering patients to make informed choices to help them achieve their goals.



12.     According to its public filings with the United States Securities and

Exchange Commission (the "*SEC*"), LifeStance broadcasts:

**Overview**

Our vision is a truly healthy society where mental and physical healthcare are unified to make lives better. Our mission is to help people lead healthier, more fulfilling lives by improving access to trusted, affordable and personalized mental health care. To fulfill this mission, we have built one of the nation's largest outpatient mental health platforms based on number of clinicians and geographic scale.

We are dedicated to improving the lives of our patients by reimagining mental health through a disruptive, tech-enabled in-person and virtual care delivery model built to expand access and affordability, improve outcomes and lower overall health care costs. We combine a personalized, digitally-powered patient experience with differentiated, multidisciplinary clinical capabilities and in-network insurance relationships to fundamentally transform patient access to mental health treatment. By revolutionizing the way mental health care is delivered, we believe we have, an opportunity to improve the lives and health of millions of individuals.

We employed 5,631 licensed mental health clinicians through our subsidiaries and affiliated practices in 33 states as of December 31, 2022. Our clinicians offer patients a comprehensive, multidisciplinary suite of mental health services, spanning psychiatric evaluations and treatment, psychological and neuropsychological testing, and individual, family and group therapy. We treat a broad range of mental health conditions, including anxiety, depression, bipolar disorder, eating disorders, psychotic disorders and post-traumatic stress disorder. Patients can receive care virtually through our online delivery platform or in-person at one of our conveniently located centers. Through our payor relationships, including national agreements with multiple payors, patients can utilize their in-network benefits when they receive care from one of our clinicians, enhancing access and affordability.

Mental illness is a large and growing crisis that creates a significant burden on the healthcare ecosystem. One in five U.S. adults and one in six youths will experience mental illness each year and over 50% of adults will experience mental health issues during their lifetime. This disease burden has a broader impact across all of healthcare—healthcare costs for individuals with mental health conditions, including depression, have been shown to be approximately three and a half times higher than for people without those conditions.

However, there are significant barriers to addressing this crisis:

- *Lack of Access:* Despite this large burden, access to mental health treatment is plagued by significant challenges. Even if patients are able to access a mental health professional, studies show they often face significant wait times. During this time, their underlying physical and mental health issues may worsen, potentially requiring treatment in costlier care settings like hospitals, emergency rooms and inpatient mental facilities.

- *Lack of Affordability:* The mental healthcare market remains highly fragmented, forcing patients to pay cash out-of-pocket for treatment and, therefore, reducing the likelihood that patients will receive treatment.

- *Lack of Scale and Organization:* Outpatient mental health is highly fragmented. We believe that independent clinicians are burdened with significant non-clinical business demands, including marketing, payor contracting, billing and collecting, and other administrative tasks, impeding their ability to focus on their patients' care. A corresponding lack of resources to invest in infrastructure and technology exacerbates these burdens, even as growing regulatory and compliance requirements increase the need for them. This lack of technology further constrains access issues—for example, through limited or no virtual capabilities—while impeding the ability to effectively track patient data and outcomes as needed to ensure care is being delivered effectively.

- *Lack of Care Coordination:* Many primary care physicians and specialists are not well-equipped to identify and treat patients with mental health conditions, resulting in many patients receiving treatments only once their condition has been exacerbated or not receiving treatment at all. This limited access to treatment has a significant social and economic impact.

We founded LifeStance to solve these challenges. More broadly, we recognized that addressing this unmet need would require a transformation of how mental health care is built and delivered. We developed powerful incentives for each of our stakeholders—patients, clinicians, payors and primary care and specialist physicians—to align with our mission, adopt our platform and drive our growth.

1

We estimate that the outpatient mental healthcare market in the United States was approximately $116 billion as of 2020 and today there are over 50 million patients in the United States with a mental health issue that our clinicians could address. We expect that the market will nearly double from 2020 to 2025 at a compound annual growth rate of 14%, to approximately $215 billion.

13.     Virtually all of LifeStance's revenue is generated by its Clinicians, which means LifeStance's business would collapse if it did not have several thousand hard working Clinicians to service its patients.



*How We Generate Revenue*

We generate revenue on a per-visit basis when a patient receives care from one of our clinicians. Depending on the state, our clinicians are either employed directly through our subsidiaries or through our affiliated practices, for which we manage day-to-day operations pursuant to long-term management services contracts. Our revenue is generally derived from patients with in-network insurance coverage, pursuant to which our subsidiaries or affiliated practices are reimbursed for patient services. For the year ended December 31, 2022, 91% of our revenue was derived from patients with commercial in-network payors, 4% of our revenue was derived from patients with government payors, 4% of our revenue was derived from patients on a self-pay basis and 1% of our revenue was derived from non-patient services. Our contracts with payors are typically structured as fee-for-service arrangements, with negotiated reimbursement rates for our clinical services. With respect to our affiliated practices, our revenue is derived from management fees negotiated under our management services contracts. We believe we are well-positioned to grow our revenue by catering to each of our stakeholders and remaining focused on our patient-centered mission.

14.     This fundamental dependence on Clinicians puts pressure on senior management to focus on increasing the number of Clinicians it employs, retaining these individuals, and rigorously increasing the number of daily patient encounters per Clinician to enable LifeStance to achieve its revenue projections; LifeStance's inability to execute this critical business objective could result in its demise as a going concern.

*Our Clinicians*

We strive to provide a best-in-class working environment for our 5,631 employed psychiatrists, APNs, psychologists and therapists. We believe our dedicated employment model offers a superior value proposition compared to independent practice. We employ a comprehensive range of mental health professionals to provide multi-disciplinary clinical modalities through our subsidiaries and our affiliated practices. We serve all patient demographics— children, adolescents, adults and geriatrics. Patients have seamless access to our team of licensed mental health clinicians, including psychiatrists, APNs, psychologists and therapists. Our breadth of clinical capabilities facilitates coordination across psychiatric and psychotherapy treatment modalities, limiting the need to refer patients externally as their needs are met within our comprehensive service offerings. Our clinicians have access to our digital

5

platform, which allows for shared electronic medical records for internal communication, and facilitates patient referrals within our clinician team, both of which support our collaborative approach to care.

B.      *LifeStance's Initial Public Offering and Growth Strategy.*

15.     On February 16, 2021, LifeStance filed a Registration Statement on Form S-1 with the SEC, which, after several amendments made in response to comments from the SEC, would later be utilized for the initial public offering of its stock to be traded on the NASDQ™ stock exchange under the ticker symbol LFST.

16.     LifeStance initiated a growth strategy, in anticipation of its public offering, to radically increase the number of Clinicians (nationwide) it employs to embellish its gross revenues numbers to support its representations in its initial public offering documents to induce investment as alleged in the securities class action lawsuit pending in the United States District Court for the Southern District of New York, a case styled – *Nizar S. Nayani et al vs. LifeStance Health Group, Inc. et al.*, Case No. 1:22-cv-06833 (SDNY 2022).

17.     The characteristic of LifeStance's growth strategy was its cavalier undertaking to radically increase the number of Clinicians (nationwide) by desperately acquiring existing psychiatric practices, and opening numerous new facilities, throughout the United States while carelessly placing Clinicians in these facilities knowing that it did not have sustainable patient numbers and operational resources to support this ill-conceived growth strategy.

18.     While LifeStance's duplicitous growth strategy temporarily boosted its stock value, this anarchic strategy has ultimately become a cataclysm afflicting its employees and its ability to live up to its lofty and unrealistic growth projections, which is evidenced by the fact that LifeStance's stock value has plummeted over sixty percent since its initial public offering.

C.     _Outbreak of Clinician Resignations._

19.     LifeStance experienced a disturbing surge in Clinician resignations during the period leading up to its initial public offering and has since experienced a steady flow of Clinician resignations because it eschews modifying or correcting its foreboding and dysfunctional business practices, especially as it relates to compensating Clinicians[1].

---

[1] It was generally known that the increase in Clinician resignations before the initial public offering was a frequent topic of discussion in meetings held among senior LifeStance managers, including meetings attended by LifeStance's regional presidents, regional clinical and medical directors, and senior clinical and medical directors, as well as meetings attended by LifeStance's chief growth officer, chief medical officer, and senior clinical and medical directors.

20.    This outbreak of Clinician resignations was and continues to be attributable to:

a.    Hopelessness, despair, and distrust about their compensation, especially considering the promises (or misrepresentations) made by LifeStance during the recruitment and hiring process about the "significant" compensation each person could expect to receive as a LifeStance employee.

b.    Dejection due to delays in receiving the network provider credentials necessary to bill for the Clinician's services, which significantly impacts the Clinician's ability to deliver clinical services to patients and earn an income.

c.    Appallingly deficient operational resources (IT support, practice management resources, billing staff and support, office staff, knowledgeable individuals to assist patients with insurance questions, scheduling staff and other similar resources, and so forth), essential to enable Clinicians to effectively deliver clinical services to their patients.

d.    A prominent lack of patients, despite representations by LifeStance to the contrary, coupled with Clinician overstaffing at various facilities with more Clinicians than patients available to keep each Clinician fully engaged and profitable.

e.    Distressing business practices concerning its ethics with balance billing, underbilling, billing errors, collections, deficiencies in the administration of all patient insurance approvals and post visit billings, audits and investigations related to the way LifeStance managed its billings, among other significant administrative dysfunction that LifeStance attempted to control as its senior management made a mad dash to expand the corporation's revenue base leading up to the initial public offering.

D.    *LifeStance's Subterfuge to Lure Clinicians into Accepting Employment with the Company.*

21.    Evidence will show that LifeStance engaged in a deliberate and planned subterfuge to lure prospective employees (Clinicians) into accepting employment with the company.

22.    The first phase of this subterfuge is to deliberately deceive the person by selling them on the competitively high compensation package LifeStance offers to Clinicians, consistently advertising and telling prospects that the person will earn between $185,000 and $250,000, along with other perquisites detailed on its website and in job postings, and discussions with the human resources individuals responsible for recruiting Clinicians.





- Newly designed and modern offices.
- Full administrative support.
- Latest in digital technology.
- Strong work/life balance.
- ****Salary $185,000-246,000

Licensed Therapists are a critical part of our clinical team. We're seeking Licensed Therapists that are:

- Fully licensed in Michigan PMHNP
- Experienced in working with adult, and/or child and adolescent populations.

At LifeStance Health, we believe in a truly healthy society where mental and physical healthcare are unified to make lives better. Our mission is to help people lead healthier, more fulfilling lives by improving access to trusted, affordable, and personalized mental healthcare. Everywhere. Every day. It's a lofty goal; we know. But we make it happen with the best team in behavioral health.

Thank you for taking the time to explore a career with us. As the fastest growing behavioral health practice group in the country, now is the perfect time to join our

Sign up for job alerts



⏱ 3 days ago   💼 Full-time   ⚕ Health insurance   🦷 Dental insurance

## Job highlights

Identified by Google from the original job post

### Qualifications

- Fully licensed in one or more US states, BE/BC, unencumbered DEA
- Experienced in both medication management as well as therapy for child and adolescent populations

### Benefits

- Flexible work schedules
- Full-time and part-time available
- 100% outpatient work
- Generous 'above market' compensation with unlimited/uncapped earnings
- Sign-on bonus
- Full benefits package: health, dental, vision, life, 401k (with match), paid parental leave, holidays, EAP and more
- Additional compensation for collaboration with mid-levels (optional)
- Collegial work environment
- Newly designed and modern offices
- Strong work/life balance
- Long term stock incentive plan
- Annual Income Potential - $308k-$370k range

23.    Based on the representations made on its website and other promotion and recruiting materials there is no doubt that LifeStance sets the expectation that a new Clinician would receive a salary – and not a loan against future earnings – which would range between $185,000 and $245,000.[2]

24.    In addition to LifeStance's representations in its recruiting initiatives, it is noteworthy to likewise consider the representations it makes in its public filings with the SEC, including its annual report for fiscal year 2022:

*Our Clinicians Are Empowered to Focus on Improving the Lives of Their Patients*

We deliver value to our clinicians through our "Seven Points of Value" clinician value proposition:

- *Mission-driven culture:* Our platform enables our clinicians to focus on delivering the best possible care to their patients. We augment their ability to serve their patients through technology tools and data, while freeing them from the many non-clinical burdens they face in independent practice.

- *Collegial and collaborative:* We promote a clinical culture of collaboration and ongoing learning for our team of mental health professionals. Our clinicians share evidence-based practices and meet regularly for continuing education and other collaborative opportunities for learning. They are also strongly supported to work together across disciplines to provide the most comprehensive and clinically effective care possible—often the most effective, evidence-based treatment modality is a combination of psychotherapy and psychiatric medication, and our mix of prescribers and non-prescribers supports the ability to provide optimal patient care.

- *Strong work-life balance:* Our conveniently located centers and virtual care delivery platform provide our clinicians with greater flexibility and convenience to serve their patients in whatever environment is most suitable. This flexibility improves clinician engagement, efficiency and their overall working environment.

- *Enhanced digital tools:* We have built a centralized operating platform that enables significant efficiencies for our clinicians, alleviating administrative burden, expanding availability for patient care and improving overall clinician satisfaction. Our unified electronic health record tracking platform, combined with our management of day-to-day operational aspects such as marketing, payor contracting, billing and collecting, intake, and scheduling, alleviates administrative burden and improves overall career engagement.

- *Robust support services:* With our robust support services, we alleviate the administrative burden and free clinicians from the many nonclinical burdens they face in an independent practice, allowing them to dedicate their time to patient care.

- *Competitive compensation package:* Our clinicians are employed as W-2 employees by our subsidiaries and affiliated practices rather than as independent contractors, the latter of which we believe is more common in the mental healthcare industry in the United States. Additionally, we offer a flexible visit-based economic model, which allows our clinicians to build their patient panels while flexibly managing caseloads in line with clinicians' personal preferences.

- *Ownership mentality:* We believe investing in our talent in human capital is paramount. Under our employee equity incentive program, we make grants to eligible employees, including clinicians. For clinicians, eligibility for equity awards and vesting are tied to productivity, directly serving our mission of expanding access to mental healthcare. We believe our equity program boosts our value proposition in a highly competitive labor market, can help attract and retain the talent needed for our patient-centric business model, and promotes an ownership mindset among our employees, including our clinicians. Just as critically, it aligns with our values and purpose and builds on a history of investment in

3

---

[2] Job positions in Cities such as New York, Chicago and various other metropolitan areas show a range of $185,000 to $300,000 for the starting salary.  Social workers, who are also treated as Clinicians by LifeStance have a general range of $60,000 to $120,000 for their "salary," but with the same payment metrics as the nurse practitioners and other nonphysician Clinicians, thus subjecting them to the very same scheme.

25.     LifeStance's statement in its 2022 10-K filing about the "competitive compensation package it offers clinicians is very telling in that LifeStance boasts that its "clinicians are employed as W-2 employees. . . rather than independent contractors, the latter of which we believe is more common in the mental healthcare industry in the United States."

26.     This material representation, or some may argue misrepresentation, is critical to the issue of Clinician compensation in this Action.  On the one hand, LifeStance boasts of treating its Clinicians as employees, paying them competitive compensation packages, higher salaries, and the like, while at the same time taking advantage of a payment scheme that is more similar to an independent contractor minus the aspects of such a relationship that would prevent it from becoming a form of indentured slavery.

27.     The second phase of this subterfuge is to systematically conceal LifeStance's plot to treat all wages paid during the first six to twelve months of the Clinician's employment as a loan disguised as an advance that LifeStance expected the Clinician to repay if the person failed to satisfy LifeStance's circuitous performance metrics; this obligation to repay wages follows the employee if the person leaves the company before LifeStance can recuperate the debt from the employee's wages plus an exorbitant rate of interest.

28.     Neither LifeStance's job postings nor its public disclosure in filings with the SEC make mention of the "advance" or the fact that a Clinician is expected to repay his/her salary if the employee fails to satisfy LifeStance's circuitous

performance metrics, and it certainly makes no mention of the fact that the advance would be treated as a loan that the person is expected to repay in full if the person leaves the company before LifeStance can reclaim the full amount of its investment/advance from the employee.

29.     The prospective employee (Clinician) thus accepts employment with LifeStance under the delusion of earning a competitive salary when in fact the employee is signing up to become an indentured servant[3].

30.     Another aspect of LifeStance's subterfuge is the delays and complications the person faces to obtain network provider credentials necessary to achieve LifeStance's mercurial performance objectives.

31.     It is fair to conclude that LifeStance was not only aware of the barriers, delays and complications associated by the credentialing process, but it also deliberately concealed them as part of its Machiavellian compensation scheme codenamed "an advance" – which was contrived to preserve its ability to recoup any wages paid to Clinicians at the whim of LifeStance's senior management because LifeStance knew that it would not recognize profit from employing these newly hired Clinicians for several months; LifeStance basically passes its overhead

---

[3] Indentured servitude is a form of labor where an individual is under contract to work without a salary to repay an indenture or loan within a certain timeframe.   In this instance, the indentured servitude was the first full year of compensation and would last until the person repaid the indenture in full (including all interest), with the expectation and obligation that the indenture would be paid even if the servant/Clinician leaves the company.   The 13th Amendment to the United States Constitution, however, made indentured servitude illegal in the United States and it is banned in nearly all countries.

associated with the employee onto the employee to bare the risk of accepting employment.

32.    Another distressing aspect of LifeStance's subterfuge relates to its abuse of its leverage (discussed below) to force resigning Clinicians to give thirty to sixty days advance notice of the person's intent to terminate his/her employment, often discarding the person earlier once LifeStance can make certain adjustments.

33.    LifeStance strategically exploits this notice period to reassign a Clinician's patients to another therapist, while simultaneously taking steps to attenuate the Clinician's ability to earn an income during the notice period; in most if not all instances, Clinicians receive little to no income during these pay periods.

E.    *LifeStance's Refusal to Pay Clinicians the Full Amount of Compensation Earned, Along With its Refusal to Disclose Information About its Employer Generated Debt and the Employee's Financial Performance Metrics Necessary to Determine Gross Wages.*

34.    LifeStance systematically refuses to pay Clinicians the full percentage of the service billing codes billed to insurance as specifically promised during the recruitment process and stated in LifeStance's corporate policies, contractual agreements, and elsewhere in its business records[4].

---

[4] LifeStance is obligated to compensate Clinicians between fifty and sixty percent of the gross amounts billed to payors related to the Clinician's treatment and service to LifeStance patients.

35.    LifeStance does not share any information with Clinicians about the metrics or data used to calculate their gross compensation or corresponding deductions from the "advance" each pay period.

36.    The employee's pay stub merely states a "gross number", and provides minimal details about tax, insurance, and other standard deductions, but provides no information on how the gross wage number was determined, whether the number was an advance or actual wages, and the pay stub provides no details explaining deductions related to the "advance."

37.    Clinicians have habitually complained about this issue to LifeStance's human resources personnel and management, but LifeStance rebuffs them and holds to the notion that the corporation is not obligated to share this information or any of the metrics it uses to determine the amount it arbitrarily pays to Clinicians each pay period.

38.    As a result of LifeStance's unfair and duplicitous business practices, Clinicians are unable to earn patient billing fees sufficient to offset the insurmountable debt obligation spawned from these "advances" due primarily to LifeStance's mishandling of its operations, its plot to use this debt to create indentured servitude, its goal of placing obstacles that stifle a Clinician's ability to satisfy LifeStance's circuitous metrics for compensating them, and providing the leverage LifeStance needs to control the Clinician's behavior by bullying them.

39.     The fees a Clinician earns from rendering patient services are inhumanely constrained (to the extent these individuals receive any compensation), resulting in the stockpiling of unbearable and insurmountable levels of debt that must, in the absence of earned fees, be repaid.

40.     Preliminary investigation into these issues reveals that the range of debt Clinicians have and are likely to incur ranges between $10,000 and $50,000, depending on the length of time the person worked for LifeStance.

F.     *LifeStance's Ruthless Use of Employer Generated Debt to Impose Indentured Servitude to Leverage and Supplement its Failing Financial Performance.*

41.     LifeStance's indentured servitude is so ruthless that the company routinely pays an advance to Clinicians in instances where the person specifically requests that LifeStance cease making the advance to avoid getting further into debt.

42.     LifeStance's indentured servitude includes a ploy to use the insurmountable obligation as leverage to hold the employee hostage until LifeStance can replace the employee once the Clinician gives LifeStance notice of the person's decision to terminate her/his employment.

43.     LifeStance likewise uses the insurmountable obligation as leverage to cajole employees into remaining with the company (at a much lower salary) under the premise that LifeStance would excuse a portion of the debt while the Clinician "works off" the balance.

44.     The Federal Consumer Financial Protection Bureau (CFPB) has launched an inquiry into practices and financial products that may leave employees indebted to their employers, based on the concept of "employer generated debt," which is akin to indentured servitude abolished by the Thirteenth Amendment to the United States Constitution.

45.     There is a growing concern that these purported debt obligations are not only unfair, and unconstitutional, they are a gross injustice to Americans and a dereliction of public policy.

46.     For example, workers may not understand that these arrangements involve an extension of credit, and they may not know whether they have the ability to comparison shop for credit offered by others or whether entering into the debt agreement is a condition of employment.

47.     Another major policy concern is whether the worker understands whether the status of the debt may impact a decision to seek alternative employment.

48.     These potential risks might limit competition in the labor market and in the market for similar consumer financial products and services that would not turn the person into an indentured servant of her or his employer.

49.     Total household debt in the United States rose by $148 billion, or 0.9 percent, to $17.05 trillion in the first quarter of 2023, according to the latest *Quarterly Report on Household Debt and Credit*.

50.     Mortgage balances climbed by $121 billion and stood at $12.04 trillion at the end of March 2023. Auto loan and student loan balances also increased to $1.56 trillion and $1.60 trillion, respectively, but credit card balances were flat at $986 billion, according to the Federal Reserve.

51.     With average consumer debt in America on the rise, it's no surprise that debt delinquency – missed payments of 30 days or more – has increased for nearly all debt types.

52.     Even with that $16.9 trillion shared by about 340 million people, consumer debt statistics show that Americans are feeling the pain.

53.     There is little debate in the United States that consumer debt is a major source of trauma on Americans, with debt being one of the most significant contributing factors to the decline of mental, emotional, and physical health in America over the past two decades, including being a leading cause in the rise in the destruction of American families through divorce, suicide, and other dreadful life events.

54.     While some Americans may have the pleasure of taking a job to fulfill a career expectation or dream, there is little debate that most if not all Americans seek employment to support their families, loved ones, and of course themselves.

55.     Both federal and state governments have enacted many laws to protect employees from the abusive and often predatory business practices and tactics some employers execute in their effort to control hard working Americans,

habitually attempting to convert them into slaves to service solely the interests of their master.

56.     Because slavery was abolished, and government in the United States takes steps to foreclose abusive employment practices, Americans are able to take employment with the understanding that the person will be able to lawfully earn a wage to support their families and loved ones, including servicing the tremendous debt obligations that Americans are facing in these modern times.

57.     Thus, the notion that an American can become an indentured servant merely by accepting employment is absurd, its unlawful and unconstitutional, and thus LifeStance's efforts to impose indentured servitude on its employees must be stopped.

V.     COLLECTIVE ACTION ALLEGATIONS

58.     Lead Plaintiffs (and all putative members of the collective action) were (and some continue to be) nonexempt psychiatric and mental health nurse practitioners and other nonphysician employees of LifeStance - "Clinicians" - who provided mental health clinical services to LifeStance patients within the States of Florida at any time from January 2020 to the entry of judgment in this case (the "*Collective Period*") and who:

> a.     Did not receive any compensation from LifeStance, during the individual's employment, for a minimum of at least one week, with many not receiving compensation for as much as twelve weeks.

b.      Did not receive all compensation due them, to the extent the individual was paid, consistent with LifeStance's obligation to compensate them a percentage of all services billed to patients, insurance companies, and others.

c.      Paid some portion or all the specious debt obligation conceived solely by LifeStance for its own benefit as a condition of the employee's employment.

d.      Who had deductions from their wages for a debt and other obligations that were never disclosed or explained to them.

59.     Clinicians were nonexempt employees for the applicable periods and were issued W2s by LifeStance.

60.     Clinicians routinely worked forty and more hours per week several times a month while employed by LifeStance.

61.     Clinicians routinely received compensation at a rate of less than $450 per week for at least one week and as much as twelve weeks, with most having a pay period in which the employee did not receive any compensation for an entire month.

62.     LifeStance's ruthless business practices of creating indentured servitude vis-à-vis the advance, effectively eradicated the notion that Clinicians received any wages during the first six to twelve months of employment, since these funds were in treated as a loan by LifeStance that the employee must repay without exception.

63.   Therefore, since the advances were a "loan" and not wages (according to LifeStance) then the Clinician did not actually receive any wages during their first six to twelve months of employment, and in fact, the Clinician would not receive any wages until such time as the person generated enough fee income to repay its indenture to LifeStance and could receive compensation free and clear of any repayment expectation.

64.   LifeStance's unlawful compensation practices violate the Fair Labor Standards Act, 29 U.S.C. §§ 206, 207, 215 (the "_FLSA_"), which obligates LifeStance to pay nonexempt employees, including overtime and minimum wages, for all hours worked.

65.   Pursuant to the FLSA, Lead Plaintiffs, and all others similarly situated, seek to prosecute their claims as a collective action on behalf of all current and former Clinicians during the applicable statutory period who were not compensated appropriately for all hours worked.

66.   A collective action is appropriate in this circumstance because the collective action members are similarly situated in that:

⇒ They were all subjected to LifeStance's ruthless and systematic unlawful compensation practices that deprived them of earning at least the federal minimum wage for all hours worked, failing to pay them overtime wages when appropriate, or both.

⇒ Each was to be paid on the same pay scale and formula, making the problems alleged herein the same for any person that was or is a Clinician.

⇒ They were victims of LifeStance's ruthless and predatory scheme to not pay its employees all wages earned, and to use the employee's wages as an asset on its balance sheet to impress its investors.

⇒ They were forced to endure LifeStance's predatory, systematic, and retaliatory behavior that denied them compensation, imposed illegally fabricated debt upon them, forced termination of employment (i.e., constructive termination), and which in almost every case caused the person to suffer emotional, psychological, and often physical harm.

⇒ LifeStance engaged in other dishonest conduct described above and later in this pleading, including, but not limited to, forcing indentured servitude vis-à-vis the unlawful and unconstitutional Clinician employment agreement that LifeStance required each of these individuals to sign as a condition of employment and continued employment.

67.     Lead Plaintiffs, and all others similarly situated, are seeking statutory liquidated damages as provided by federal law for LifeStance's systematic, ruthless, and predatory failure to pay wages as required by the FLSA, among other things.

68.     The class of similarly situated individuals or potential collective members sought to be certified pursuant to the FLSA is defined as a person who was or is a Clinician during the Collective Period that suffered from the issues outlined in Paragraphs 20 through 57 above (among other issues outlined throughout this pleadings).

69.     Based on preliminary investigation, members of the collective class can be placed into three separate subclasses:

⇒ Individuals classified by LifeStance as a licensed therapist or psychologist.

⇒ Individuals classified by LifeStance as a licensed psychiatric nurse practitioner.

⇒ Individuals classified by LifeStance as a licensed clinical social worker.

70.     The precise size and identity of the entire group of individuals comprising the collective action class members is ascertainable from LifeStance's business records, tax records, and/or employee personnel records, including its website (https://lifestance.com) and those of its affiliated treatment facilities, which provides the name of all Clinicians purportedly "currently employed" by LifeStance, and contains information about person who were Clinicians and their historical employment data.

71.     LifeStance compensated the collective action members in the same manner and under the same unlawful employee compensation program, and each of them has worked in Florida during the Collective Period.

72.     Lead Plaintiffs maintain the right to modify the collective action member definition and/or to create additional subclasses or classes, if necessary, and to revise these definitions to maintain cohesive classes which do not require individual inquiry to determine liability.

VI.    CLASS ACTION ALLEGATIONS

73.     Lead Plaintiffs (and all putative members of the Class Action) were (and some continue to be) "Clinicians", as defined above, at any time from January 2020 to the entry of judgment in this case (the "*Class Period*") and who suffered financial harm during the Class Period that suffered from the issues outlined in Paragraphs 20 through 57 above (among any other issues address in this pleading).

74.     Pursuant to Fed. R. Civ. P. 23, Lead Plaintiffs, and the Class Members, seek to prosecute their declaratory relief and common law claim as a class action on behalf of all current and former LifeStance employees who were not compensated appropriately for services performed as Clinicians for LifeStance.

75.     A class action is appropriate in this circumstance because the Class Members are similarly situated in that they were subjected to LifeStance's unlawful employment practices while performing services on LifeStance's behalf, such as providing treatment to children, adolescents, and adults suffering from a variety of mental health issues and increasing profits for the benefit of LifeStance through their activities.

76.     Lead Plaintiffs and putative class members were non-exempt employees for the applicable periods and were issued W2s by LifeStance.

77.     The class of similarly situated individuals or potential Class Members sought to be certified pursuant to Fed. R. Civ. Pro. 23 is defined in above.

78.     Based on preliminary investigation, members of the class action can be placed into three separate subclasses:

> ⇒ Individuals classified by LifeStance as a licensed therapist or psychologist.

> ⇒ Individuals classified by LifeStance as a licensed psychiatric nurse practitioner.

> ⇒ Individuals classified by LifeStance as a licensed clinical social worker.

79.     The precise size and identity of the entire class is ascertainable from LifeStance's business records, tax records, and/or employee personnel records, including its website (https://lifestance.com), which provides the name of all Clinicians purportedly "currently employed" by LifeStance.

A.     *Numerosity of the Class.*

80.     Class Members are so numerous that their individual joinder is impracticable.

81.     Although the precise identities, numbers and addresses of all Class Members are currently unknown to Lead Plaintiffs, the facts on which the calculation of that number can be based are presently within the sole control of LifeStance.

82.     Upon information and belief, there are three hundred and fifty (350) or more potential members of the class action during the Class Period.

B.     *Existence of Common Questions of Fact and Law.*

83.     There is well-defined commonality in the questions of law and fact involved affecting Class Members. The common questions of law include, but are not limited to:

a.     Whether LifeStance employed Class Members within the meaning and classifications as prescribed by law.

b.     What proof of hours worked is sufficient where employers fail in their duty to maintain time records.

      c.      Whether LifeStance failed and/or refused to pay Class Members for services performed for the direct benefit of LifeStance.

      d.      Whether LifeStance failed and/or refused to compensate Class Members for all hours worked and benefits conferred to LifeStance.

      e.      The misclassification and/or appropriate classification of the Class Members.

      f.      Whether the loan disguised as a wage advance is unconstitutional since it creates indentured servitude in violation of the 13th Amendment of the United States Constitution.

      g.      Whether LifeStance's efforts to reclaim wages vis-à-vis calling them an advance is lawful and enforceable.

      h.      Whether LifeStance must repay any portions of the so-called advance that it has collected from its employees.

      i.      Whether LifeStance acted with intention—willfully and maliciously—in its actions; and

      j.      Whether LifeStance is liable for all damages claimed hereunder, including but not limited to compensatory, liquidated, interest, costs and disbursements, and attorneys' fees.

C.      *Typicality of the Class.*

84.      Lead Plaintiffs' claims are typical of the claims of all Class Members because they were employed in the same capacity during the Class Period; Lead Plaintiffs experienced the same harms and violations of law as all other Class Members.

85.     Additionally, all claims arise from the same conduct and factual basis including LifeStance's historical ruthless, impious, and predatory compensation practices, as described above.

> D.     _Adequacy of the Class Representatives and Counsel._

86.     Lead Plaintiffs are adequate representatives of Class Members because their interests do not conflict with the interests of the other Class Members they seek to represent.

87.     Lead Plaintiffs have retained competent trial counsel for this class action and intend to vigorously pursue this action.

88.     Lead Plaintiffs and their trial counsel will fairly and adequately protect the interests of Class Members.

> E.     _Predominance and Superiority._

89.     A class action is superior to other available methods for the fair and efficient adjudication of this litigation—particularly in the context of wage litigation like the present action, where individual plaintiffs may lack the financial resources to vigorously prosecute a lawsuit in federal court against LifeStance.

90.     The individual members of the class do not have an interest in or capacity to bring separate actions.

91.     Lead Plaintiffs find it is desirable to concentrate the litigation into one cohesive case.

92.     There are no likely difficulties that will arise in managing the class action.

93.     This suit may be maintained as a class action under Federal Rule of Civil Procedure 23(b)(3) because questions of fact and law common to the Class Members predominate over the questions affecting only individual members of the class; a class action is superior to other available means for the fair and efficient adjudication of this action.

94.     The damages suffered by individual Class Members may be disproportionate to the burden and expense of complex litigation of these claims on an individual basis.

95.     Additionally, individual litigation may lead to inconsistent and conflicting judgments against LifeStance; therefore, effective redress for every Class Member may be limited or impossible.

96.     A class action which involves all Class Members favors judicial economy, fairness, and provides the benefit of a single, consistent, adjudication on the issues herein claimed.

97.     Lead Plaintiffs maintain the right to modify the class and or create additional subclasses or classes, if necessary, and to revise these definitions to maintain cohesive classes which do not require individual inquiry to determine liability.

VII.   BASIC CONDITIONS PRECEDENT ALLEGATIONS

98.    Lead Plaintiffs have engaged the law firm of éclat law, PA to serve as its lead trial counsel and are obligated to compensate these law firms for services rendered in connection with prosecuting the Collective Members and Class Members' rights as alleged herein.

99.    All conditions precedent to filing this lawsuit have occurred, have expired, or have been effectively waived.

## COUNT I: FAIR LABOR STANDARDS ACT

100.   The Lead Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 72, 98 and 99 as if fully set forth herein.

101.   This is a cause of action for unpaid wages and damages under the Fair Labor Standards Act, 29 U.S.C. § 201, et. seq.

102.   LifeStance was or continues to be the employer of all Clinicians, the individuals that would comprise the members of the collective action within the meaning of FLSA 29 U.S.C. §203(d).

103.   Clinicians (the individuals that would comprise the members of the collective action) were or continue to be "employees" of LifeStance within the meaning of FLSA, 29 U.S.C. § 203.

104.   Although the Plaintiffs are medical professionals (however, they are not doctors), they were W2 employees that literally received no income for several weeks out of the year for the service they provided to patients on LifeStance's

behalf, including without limitations the constraints on receiving compensation articulated in paragraphs 20 through 57.

105.   The Clinicians were hired by LifeStance to perform duties on behalf of and for the benefit of LifeStance consistent with its overall business platform and objectives as described generally in paragraphs 20 through 57 above.

106.   By failing to pay the Clinicians (the individuals that will comprise the members of the collective action) minimum wages, overtime wages, failing to outright pay complete wages free and clear as required by law, LifeStance has violated Sections 206, 207, and 215 of the FLSA, amongst other laws, and such conduct was willful within the meaning of the FLSA.

107.   LifeStance understood it had an affirmative obligation to pay the Collective Members for all hours that they spent working for its benefit, yet it intentionally and routinely failed to pay such compensation as described above.

108.   LifeStance a culture of toxicity and a hostile work environment during, after, and before the applicable period at issue, which included, but was not limited to, the indentured servitude described previously in this pleading.

109.   Instead of lawfully paying its employees, LifeStance established and maintained systems, policies, and procedures that were intentionally designed to avoid paying employees their earned wages as detailed in the paragraphs above.

110.   LifeStance has engaged in a widespread systematic pattern, policy, and practice of violating the FLSA, as detailed throughout this Complaint.

111.   The Clinicians are entitled to be paid at least minimum wage for all hours worked during the workweek pursuant to FLSA 29 U.S.C. § 206.

112.   LifeStance violated FLSA 29 U.S.C. § 206 by failing to pay the Clinicians minimum wages for all hours worked, as described above, and caused the Clinicians to suffer lost wages and interest thereon.

113.   LifeStance knowingly and willfully carried out its illegal pattern or practice of failing to pay proper wages as compensation.

114.   As a result of LifeStance's intentional, willful, and unlawful acts in refusing to pay the Clinicians minimum wages, overtime wages, and wages in general (i.e., no payment was made at all) for one or more workweeks during the applicable Collective Period, the Clinicians have suffered damages, and incurred reasonable attorneys' fees and costs as provided in the FLSA.

115.   As a result of LifeStance's willful violation of FLSA § 206, 207, and 215, the Clinicians are entitled to recover the full amount of any unpaid back wages unlawfully withheld, and any damages experienced due to LifeStance's retaliatory acts and liquidated damages as per 29 U.S.C. § 216 and other provisions within the FLSA statute.

116.   The Clinicians are entitled to recover from LifeStance their unpaid minimum wages / overtime wages, damages for unreasonably delayed payment of wages, and any damages experienced due to LifeStance's retaliatory acts, liquidated damages or pre-judgment interests, reasonable attorneys' fees, and costs and disbursements pursuant to the FLSA statute.

117.    Because LifeStance's violations of the FLSA have been willful, a three-year statute of limitations applies pursuant to 29 U.S.C. § 255.

## COUNT II - FAIR LABOR STANDARDS ACT – KICK BACKS

118.    The Lead Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 72, 98 and 99 as if fully set forth herein.

119.    Pursuant to 29 C.F.R. § 531.35, wages cannot be considered to have been paid by the employer to the employee unless they are paid finally and unconditionally or "free and clear."

120.    Further, wage requirements will not be met where the employee is required to "kicks-back" directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wages delivered to the employee.

121.    Kickbacks include but are not limited to direct reductions in employee's pay checks for the benefit of the employer, amongst other things.

122.    LifeStance routinely and systematically made illegal deductions to the Clinician's pay without reason or description—a benefit kicked-back directly to LifeStance as described in paragraphs 20 through 57 above.

123.    Thus, Clinicians were routinely forced to kick-back their wages to LifeStance, which consequently benefitted the employer to the detriment of the employee.

124.    LifeStance's erratic and unlawful deductions of the Clinician's earned wages resulted in its willful violation of 29 C.F.R. § 531.35 as the Collective Members' pay was not provided "free and clear" of other conditions as described with particularity throughout paragraphs 20 through 57 above.

125.    As stated earlier, wages were paid and conditioned upon repayment of a "loan" to W2 employees that must be paid back to the employer in full without exception, and LifeStance would seek to reclaim these dollars advance if the Clinician left the company prior to paying back the indenture in full.

126.    Such deductions at many times during their tenure with LifeStance caused Clinicians to earn $0 for work conducted or, less than $450.00 in a given week.

127.    As a direct and proximate result of the kickbacks described throughout this Complaint, the Clinicians were damaged because they did not enjoy the earned benefit of their whole paycheck, without any kickbacks to LifeStance.

## COUNT III: DECLARATORY RELIEF

128.    Lead Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 57, and 73 through 99 as if fully set forth herein.

129.   This is a claim against LifeStance to the federal Declaratory Judgment Act, 28 USC §2201(a), seeking a declaration that:

⇒ The advance that LifeStance uses to create indentured servitude is a violation of the 13th Amendment to the United States Constitution, thereby making it an illegal and unenforceable obligation.

⇒ LifeStance cannot take any further action to seek to collect on its indenture as such action is unconstitutional and thus unenforceable.

⇒ LifeStance must repay all Clinicians whatever portion of the indenture it has collected from them as of the date of the entry of final judgment in this action.

130.   The parties are in dispute as to the validity and enforceability of LifeStance's unconscionable, predatory, and unconstitutional compensation policies, procedures, and agreements including its creation of indentured servitude wherein it expects its employees to repay all wages "advanced" to them during their first six to twelve months of employment.

131.   While it appears that LifeStance may recognize that its scheme to recover wages and other compensation earned by its Clinicians is unethical, unlawful, and perhaps ruthless and predatory, LifeStance nonetheless continues to create these unconstitutional obligations and continues to seek to enforce them by engaging in aggressive tactics against the Clinicians to collect the money, including those articulated specifically in paragraphs 36 through 57.

132.   LifeStance has threatened legal action against Lead Plaintiffs and other Clinicians for nonpayment of this indenture, which Lead Plaintiffs and all Clinicians contend is unconstitutional as it violates the 13th Amendment to the United States Constitution, among other laws, and public policy of protecting Americans against slavery in any form.

133.   Lead Plaintiffs and all Clinicians affirmatively assert that LifeStance's attempt to reclaim (or keep) wages that the Clinician have lawfully eared is not valid, binding, or enforceable – this proscribed conduct is unconscionable, unconstitutional, against public, and therefore should not be enforce as a matter of law.

134.   An actual controversy exists as to the rights and obligations of the respective parties.

135.   LifeStance illegally reclaims and takes wages that it pays to its Clinicians by calling them "an advance" in its Machiavellian attempt to create the illusion that it is paying its employees the competitive salary that it agreed to pay them when they accepted employment with LifeStance, while at the same time creating an artifice by which they can take a significant portion of those wages back from the employee, together with interest accruing on a monthly basis.

136.   LifeStance is of the opinion that its behavior is lawful, and thus it continues to require Clinicians repay the advance under the guise that the corporation has the right to require an indenture as a condition of employment, although this indenture does not apply to senior management at LifeStance, none

of whom are a Clinician or an individual that actually generates an income for the corporation.

**2022 Base Salary and Annual Bonus**

The base salaries of our named executive officers are initially set forth in their respective employment agreements, and are subject to annual review by our Board of Directors or the compensation committee. For 2022, the base salary for each of Mr. Burdick, Mr. Lester, Mr. Qureshi, and Mr. Bourdon was initially $700,000, $350,204, $330,000, and $500,000, respectively. In August 2022, Mr. Lester's base salary was increased to $511,200, effective July 1, 2022. Alert5 also received consulting fees of $100,000 per year during Mr. Lester's employment with the Company.

With respect to 2022, each of Mr. Burdick, Mr. Lester, and Mr. Qureshi was eligible to receive an annual bonus. Mr. Bourdon, who commenced employment with us in November 2022, was not eligible for a 2022 annual bonus. For 2022, the target bonus amount, expressed as a percentage of base salary, for each of Mr. Burdick, Mr. Lester, and Mr. Qureshi was as follows: 100%, 100%, and 75%, respectively (prorated for each of Mr. Burdick and Mr. Lester to reflect his partial year of employment). Annual bonuses for fiscal year 2022 for our named executive officers were based on the attainment of corporate performance goals as determined by our Board of Directors or the compensation committee. The corporate performance goals for 2022 related to revenue and Adjusted EBITDA margin targets. For 2022, the Company did not achieve the threshold revenue and Adjusted EBITDA margin goals required under the annual bonus program, and as a result, none of our named executive officers received a 2022 annual bonus.

*Agreements with Our Named Executive Officers*

Each of our currently employed named executive officers is party to an employment agreement with us that sets forth the terms and conditions of his employment. The material terms of the agreements are described below. The terms "cause" and "good reason" referred to below are defined in the respective named executive officer's agreement.

*Mr. Burdick.* In connection with his appointment as Chief Executive Officer, effective September 7, 2022, we entered into an employment agreement with Mr. Burdick that provides for an entitlement to an annual base salary of $700,000 and an annual bonus opportunity, pro-rated for 2022, with a target equal to 100% of his base salary and with the actual amount of such bonus based upon achievement of performance objectives determined by our Board of Directors or the compensation committee. Under the agreement, Mr. Burdick is entitled to reimbursement for business expenses (including annual access to a maximum of fifty (50) flight hours of private aircraft service for business travel) in accordance with the Company's reimbursement policies.

*Mr. Qureshi.* On May 14, 2020, we entered into an amended and restated employment agreement with Mr. Qureshi that provides for his entitlement to an annual base salary and incentive bonus opportunity, each of which has subsequently been increased. In connection with his promotion to President, in addition to his role as Chief Operating Officer, on September 7, 2022, we entered into a

17

letter agreement with Mr. Qureshi that provides for a target annual bonus equal to 75% of his annual base salary commencing for 2022.

*Mr. Bourdon.* In connection with his appointment as Chief Financial Officer and Treasurer of the Company, effective November 10, 2022, we entered into an employment agreement with Mr. Bourdon that provides for an entitlement to an annual base salary of $500,000 and, beginning for calendar year 2023, an annual bonus opportunity with a target equal to 75% of his base salary and with the actual amount of such bonus based upon achievement of performance objectives determined by our Board of Directors or the compensation committee. In connection with his commencement of employment, pursuant to his employment agreement, the Company issued Mr. Bourdon a one-time signing bonus in the amount of $1,000,000, payable in shares of the Company's common stock based on the closing price of the Company's common stock on November 10, 2022 and which is subject to repayment by Mr. Bourdon if his employment terminates prior to November 10, 2026 for any reason other than as a result of a termination of employment by the Company without cause or a resignation by Mr. Bourdon for good reason.

Each of our named executive officers is bound by certain restrictive covenant obligations, including covenants relating to confidentiality and assignment of inventions, as well as covenants not to compete or solicit certain of our service providers, customers, and suppliers during his employment and for eighteen (18) months after termination of employment. In addition, in connection with his sale of equity interests in the TPG Acquisition (as defined below), Mr. Qureshi agreed not to disparage, compete, or solicit certain of our service providers for a period of four years, and not to disclose confidential information for a period of five years, in each case, after May 14, 2020.

*Severance Upon Termination of Employment; Change in Control.*

*Mr. Burdick.* Under his employment agreement, if Mr. Burdick's employment is terminated by the Company without cause or if Mr. Burdick resigns for good reason, he will be entitled to receive: (i) continued payment of his base salary for a period of eighteen (18) months following termination, (ii) an amount equal to his annual bonus for the year of termination, based on actual performance and pro-rated to reflect the portion of the calendar year during which he was employed ("Pro-Rata Bonus"), (iii) payment of his full COBRA premiums for eighteen (18) months following his termination, subject to his eligibility for, and timely election of, COBRA coverage, and (iv) if Mr. Burdick elects to continue his participation in our insurance plans, other than the health and dental insurance plans, payment of his full premium cost for eighteen (18) months following his termination, subject to his eligibility for such continued participation. If his employment is terminated due to his death or disability, he will receive a Pro-Rata Bonus and, upon a termination due to his disability, six months of base salary continuation (reduced by any wage continuation payments received under any of our health and disability insurance plans). Mr. Burdick is also eligible to receive severance payments and benefits under our Severance and Change in Control Policy (as amended from time to time, the "Change in Control Policy"), as described below, upon a termination of his employment in certain circumstances within the specified change in control period (without duplication with respect to any severance benefits he is entitled to under his employment agreement), which payments and benefits shall be no less favorable than those in effect under the policy on the effective date of his employment agreement.

*Mr. Qureshi.* Under his amended and restated employment agreement, if Mr. Qureshi's employment is terminated by the Company without cause or if Mr. Qureshi resigns for good reason, he will be entitled to receive: (i) continued payment of his base salary for a period of six months following termination, (ii) payment of his full COBRA premiums for six months following his termination, subject to his eligibility for, and timely election of, COBRA coverage, and (iii) if Mr. Qureshi elects to continue his participation in our insurance plans, other than the health and dental insurance plans, payment of his full premium cost for six months following his termination, subject to his eligibility for such continued participation. If his employment is terminated due to his disability, he will receive six months of base salary continuation (reduced by any wage continuation payments received under any of our health and disability insurance plans). Mr. Qureshi is also eligible to receive benefits under the Change in Control Policy, as described below, but without duplication of any severance benefits payable under his employment agreement.

*Severance Upon Termination of Employment; Change in Control.*

*Mr. Burdick.* Under his employment agreement, if Mr. Burdick's employment is terminated by the Company without cause or if Mr. Burdick resigns for good reason, he will be entitled to receive: (i) continued payment of his base salary for a period of eighteen (18) months following termination, (ii) an amount equal to his annual bonus for the year of termination, based on actual performance and pro-rated to reflect the portion of the calendar year during which he was employed ("Pro-Rata Bonus"), (iii) payment of his full COBRA premiums for eighteen (18) months following his termination, subject to his eligibility for, and timely election of, COBRA coverage, and (iv) if Mr. Burdick elects to continue his participation in our insurance plans, other than the health and dental insurance plans, payment of his full premium cost for eighteen (18) months following his termination, subject to his eligibility for such continued participation. If his employment is terminated due to his death or disability, he will receive a Pro-Rata Bonus and, upon a termination due to his disability, six months of base salary continuation (reduced by any wage continuation payments received under any of our health and disability insurance plans). Mr. Burdick is also eligible to receive severance payments and benefits under our Severance and Change in Control Policy (as amended from time to time, the "Change in Control Policy"), as described below, upon a termination of his employment in certain circumstances within the specified change in control period (without duplication with respect to any severance benefits he is entitled to under his employment agreement), which payments and benefits shall be no less favorable than those in effect under the policy on the effective date of his employment agreement.

*Mr. Qureshi.* Under his amended and restated employment agreement, if Mr. Qureshi's employment is terminated by the Company without cause or if Mr. Qureshi resigns for good reason, he will be entitled to receive: (i) continued payment of his base salary for a period of six months following termination, (ii) payment of his full COBRA premiums for six months following his termination, subject to his eligibility for, and timely election of, COBRA coverage, and (iii) if Mr. Qureshi elects to continue his participation in our insurance plans, other than the health and dental insurance plans, payment of his full premium cost for six months following his termination, subject to his eligibility for such continued participation. If his employment is terminated due to his disability, he will receive six months of base salary continuation (reduced by any wage continuation payments received under any of our health and disability insurance plans). Mr. Qureshi is also eligible to receive benefits under the Change in Control Policy, as described below, but without duplication of any severance benefits payable under his employment agreement.

*Mr. Bourdon.* Under his employment agreement, if Mr. Bourdon's employment is terminated by the Company without cause or if Mr. Bourdon resigns for good reason, he will be entitled to receive: (i) continued payment of his base salary for a period of twelve (12) months following termination, (ii) payment of his full COBRA premiums for twelve (12) months following his termination, subject to his eligibility for, and timely election of, COBRA coverage, and (iii) if Mr. Bourdon elects to continue his participation in our insurance plans, other than the health and dental insurance plans, payment of his full premium cost for twelve (12) months following his termination, subject to his eligibility for such continued participation. Mr. Bourdon is also eligible to receive severance payments and benefits under the Change in Control, as described below, upon a termination of his employment in certain circumstances within the specified change in control period (without duplication with respect to any severance benefits he is entitled to under his employment agreement), which payments and benefits shall be no less favorable than those in effect under the policy on the effective date of his employment agreement.

*Change in Control Policy.* On August 9, 2022, our Board of Directors approved the Change in Control Policy pursuant to which certain of our employees are eligible to participate, including each of our currently employed named executive officers. The terms "cause," "good reason," and "change in control" referred to below are defined in the Change in Control Policy.

18

137.    As previously mentioned, Lead Plaintiffs and Clinicians, on the other hand, contend that the indenture referred to as an advance is unlawful, unconstitutional and engenders the ancient practice of indentured servitude for Clinicians, which has long since been banned in the United States vis-à-vis the 13th Amendment to the United States Constitution.

138.    The provisions are clearly against public policy as it is certainly against the public interest to allow a publicly traded company to avoid paying its employees. It instead requires that its employees pay it (the company) for the time that the employees performed work for the company.

139.   In essence, there is no benefit provided to the employee whatsoever in exchange for performing work on behalf of LifeStance.

140.   LifeStance retains all the benefit of the significant revenue[5] it has received from the efforts of the Clinicians.

141.   Lead Plaintiffs request that the Court intervene to interpret the Clinician employment agreements and make affirmative findings to determine:

a.   Whether the "claw back" or "advance" provisions of the contract are void and unenforceable, eradicating the entire contract as compensation provisions are a material term of the contract.

b.   Whether the employment contract or corporate policies regarding "Obligations Upon Termination" is void and unenforceable as it relates to the repayment/reimbursement of the Incentives/Advance/Debt.

c.   Whether the "Compensation" and "Advance on Compensation" provisions of the contract (and accompanying schedule) are void and unenforceable, eradicating the entire contract as compensation provisions are a material term of the contract; and

d.   Whether the contract between the parties created a valid, binding, enforceable, and lawful monetary repayment obligation (debt) against Plaintiffs and in favor of LifeStance.

---

[5] LifeStance's reported gross revenue for calendar year appears to have exceeded $580,000,000 based on its public filings with the SEC.

103.    Plaintiffs have no adequate remedy at law.

PRAYER FOR RELIEF

WHEREFORE, Class Members/Collective Action Members respectfully request that judgment be entered in their favor and against LifeStance Health Group, Inc., and:

1)    Certification and acknowledgement of the Collective Action (Counts I-II of this litigation) and appointment of the above-named Plaintiffs and their counsel for the opportunity to represent the collective class action.

2)    Certification of this action (Counts III) as a Class Action pursuant to Fed. R. Civ. P. 23(b)(2) and (3) on behalf of members of the Class and appointment of the above-named Plaintiffs and their counsel to represent the class.

3)    Awarding Class Members/Collective Action Members the relief sought in each individual Count, including without limitation declaring that LifeStance's attempt to create indentured servitude is unconstitutional and thus unenforceable as a matter of law, and entering an injunction to enjoin LifeStance from continuing to engage in this unlawful conduct.

4)    Awarding Class Members/Collective Action Members and the above-named Plaintiffs liquidated damages to the full extent permissible under the law.

5)    Awarding Class Members/Collective Action Members and the above-named Plaintiffs attorneys' fees and costs pursuant to the applicable Federal laws.

6)      Awarding Class Members/Collective Action Members and the above-named Plaintiffs punitive damages and/or pre-judgement interest pursuant to the applicable Federal laws.

7)      Granting Class Action Members an Order on an expedited basis, allowing them to send notice of this action, pursuant to Fed. R. Civ. P. 23, to those similarly situated.

8)      Granting Collective Action Members an Order, on an expedited basis, allowing them to send notice of this action as a collective action pursuant to 29 U.S.C. § 216(b) to those similarly situated Collective Action Members.

9)      Entry of a judgment declaring that the employment contract in its entirety is void and unenforceable, including the eradication of the false debt that LifeStance attempts to create through the employment contract, together with any other remedy provided and applicable under law.

10)     Any other relief this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs respectfully request a jury trial on all triable issues above.

éclat law, PA
Post office Box 161850
Altamonte Springs, Florida 32716
Phone: (407) 636-7004
Lead trial counsel to Lead Plaintiffs and Class Members/Collective Action Members

_____
Kevin K. Ross-Andino, FBN 66214
kevin.ross@eclatlaw.com

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed with the Clerk of Court this 1st day of June 2023 by using the Federal Case Management/Electronic Case Files System (CM/ECF System). Accordingly, a copy of the foregoing is being served on this day to all attorney(s)/interested parties identified on the CM/ECF Electronic Service List, via transmission of Notices of Electronic Filing generated by the CM/ECF System

_____
Kevin R. Ross-Andino